## WALLACE v. BURSON.

### No. 8127.

Court of Civil Appeals of Texas. Austin.
Oct. 9, 1935.

Rehearing Denied Oct. 30, 1935.

Critz & Woodward, of Coleman, for appellant.

W. Marcus Weatherred, of Coleman, for appellee.

McCLENDON, Chief Justice.

Wallace sued Burson on a promissory note for $1,600 principal, less admitted credits, and to foreclose a chattel mortgage on 8 mules and certain farming implements. At the same time he sued out a writ of sequestration under which the mortgaged property was seized and later delivered to him under a replevy bond. The note was dated January 1, 1933, and was due January 1, 1934. The suit was filed October 16, 1933, and the note was declared due under an acceleration clause in the mortgage, alleged to read: "Said mortgage further provides that if the mortgagor should move or attempt to move, all or any of the property therein described or covered thereby, out of Coleman County, Texas, or if in the judgment of the mortgagee said property should be neglected, injured or abandoned, or if the same should be in any way mistreated or handled so as to impair the security of said mortgagee, or render the mortgagee unsafe, or if the mortgagee should in any way deem himself unsafe or insecure, that the mortgagee should at once declare said note due or take possession of said property and cause the same to be sold and applied to the payment of said indebtedness; said mortgage giving to the plaintiff herein full right and power at any time if he should feel unsafe or insecure, to declare the debt due and mature, and that said mortgagee has declared said debt due and matured and does hereby further so declare."

The ground upon which the sequestration writ was obtained is alleged in the affidavit to be: "That the affiant, plaintiff herein, fears that the defendant will injure and illtreat said property during the pendency of this suit, and that the defendant has ill-treated said property and injured the value of the same during the time he has had the possession thereof, since the execution and delivery of said mortgage."

Burson by way both of defense and cross-action pleaded:

(1) Fraud in the execution of the note and mortgage, for which he sought: (a) Cancellation and recovery of what he had paid thereon, or (in the alternative), (b) damages.

(2) Wrongful procurement of the sequestration writ under allegations falsely and maliciously made, for which he sought, as a further alternative, damages both actual and exemplary.

The cause was tried to a jury upon special issues covering each of the defendant's pleas, and judgment was rendered thereon canceling the note and mortgage, and awarding Burson $622.44, the amount he had paid thereon.

Wallace has appealed.

We sustain Wallace's contention that the evidence does not support the finding of fraud in the execution of the contract.

Briefly stated, the record shows in this regard:

Wallace owned the mules and farming implements involved, and a 505-acre tract of land. In the fall of 1932 he made an agreement with parties by the name of Stewart to sell them the mules and implements, and rent them the land for 1933, with the stipulation that, if one-sixth of the grain and one-fourth of the cotton raised on the premises during the rental year would not discharge the purchase-money note for the mules and implements, he would extend the note and lease until the note was satisfied from such proceeds. Upon one of the Stewarts declining to execute the contract, the negotiations fell through. Shortly thereafter a third party brought Wallace and Burson together, and in a preliminary conversation, according to Burson's version, the same agreement was made as with the Stewarts. A few days later the lease, note, and mortgage were executed. Neither contained the extension stipulation. Burson's fraud theory is predicated upon the allegation that Wallace represented to him that the mortgage contained this extension stipulation. There is very little variance in the evidence regarding what took place when the instruments were signed. Wallace and Burson together went to a bank in Santa Anna, and related to one Brown, who acted as scrivener in the matter, the terms of the agreement. Brown wrote the instruments, or filled in the blanks on printed forms, and they were then executed. The evidence of Burson is somewhat vague as to what specifically Brown was told to put in the mortgage, or what Wallace told him was in it after Brown had written it. His testimony in this regard was that Wallace told him the mortgage was in ac-

cordance with their previous agreement. He testified that he did not read the mortgage before signing it, but relied upon Wallace's above statement, and the belief, based on his reputation, that he was honest. The record shows conclusively that he had ample opportunity to read the mortgage, if he had chosen to do so, which was in duplicate, and a copy retained by him. No device or deception was practiced upon Burson to induce him not to read the instrument; no fiduciary relation of any character existed between the parties; and under well-recognized legal principles the evidence fails to support the allegations of fraud essential to cancellation or damages for deceit.

However, the jury findings upon the issue of wrongful sequestration, which are amply supported by evidence, sustain the trial court's judgment.

■ The jury findings in this regard were in substance: That at the time Wallace made the affidavit for the writ he did not have reasonable grounds to believe that Burson would (6) injure or (7) ill-treat the mortgaged property, or (8) to fear that he would ill-treat it during pendency of the suit. That Wallace procured issuance of the writ for the purpose (9) of depriving Burson of the possession of the property, and (10) of securing possession of the lands which Wallace had rented to Burson. (11) That Wallace did not "act in good faith in causing the writ of sequestration to be issued." The value of the sequestered property was found to be $1,732. The findings on exemplary damages are unimportant under the conclusions we have reached.

The record shows the following: The amount due on the note, plus accrued interest and less established credits, was, on the date the writ was issued, $1,104.56, or $627.44 less than the found value of the mortgaged property. Burson's equity in the property amounted to more than 50 per cent. of the debt it secured. Wallace's affidavit for the writ alleged the value of the property at $1,525, or $420 in excess of his debt. Wallace had become dissatisfied with Burson as a tenant, and in the latter part of August, or early in September, rented a part of the farm to one Ford for the year 1933, "on the halves." Wallace, under that lease, was to furnish the teams and implements with which to make the crop. As soon as Wallace got possession under his replevy bond,

he turned the mules and implements over to Ford, who used them in cultivating the farm under his lease. In the meantime, Ford had already (early in September) begun to break some of the land he had leased. Burson moved off the place shortly after the writ was served, and Ford moved into the house he had vacated. The record will amply support findings that Wallace was anxious to get possession of the implements and teams to turn them over to Ford; and to put Ford in possession of the premises; that Burson had not ill-treated, injured, or abused any of the mortgaged property, and had no intention of doing so; and that he had fairly met his obligations under the mortgage by delivering to Wallace one-sixth of the grain and one-fourth of the cotton covered by the mortgage, which was the source of the established credit of $622.44. In view of the wide margin (over 50 per cent.) in the value of Wallace's security over the amount of Burson's debt, this evidence was sufficient to support the above jury findings.

Wallace's brief contains 66 assignments of error; but no supporting propositions. We would probably be justified, under the rules, in striking out the brief altogether. We have, however, carefully read all the assignments of error and their discussion, from which we gather that, other than that the evidence will not support the above findings (which we overrule as without substantial merit), the point chiefly, if not entirely, relied upon, as regards the issue of actual damages for wrongful sequestration, is substantially as follows:

■ Since the mortgage authorized Wallace to take possession of the property upon maturity of the debt for any cause, action would not lie for damages for wrongful sequestration, regardless of the existence vel non of the grounds stated in the affidavit, where the debt had been matured under a proper exercise of the right given in the acceleration clause. This proposition seems well established in this state. 38 Tex. Jur. p. 257, § 93, and supporting authorities in footnote 10.

However, it is an essential element of a proper exercise of the acceleration clause that the conditions in fact exist which authorize its exercise.

■ Where, as here, the right is predicated upon the usual insecurity clause, the general rule is thus stated in 11 C. J. p. 555: "Although the ordinary wording of

the insecurity clause is that the·mortgagor (mortgagee) may take possession whenever he 'deems' himself insecure, the prevailing doctrine is that he must act reasonably and have probable cause to apprehend the loss ·of his claim to justify a taking, for an arbitrary power is not conferred. * * * In determining whether a mortgagee had reasonable ground to believe that he was in danger of losing his security, any competent relevant evidence may be admitted, and where the evidence is conflicting, the question of the mortgagee's good faith and the existence of reasonable grounds for his action are for the jury."

Cleveland State Bank v. Turner (Tex. Civ. App.) 278 S. W. 1107, is directly in point in support of this text.

In considering this question, we have assumed, as both parties appear to have assumed, that the acceleration clause is correctly copied in the above quotation from Wallace's petition. The copy of the mortgage embodied in the statement of facts, however, does not contain the specific provision relied upon in that pleading.

■ The wrongful sequestration of Burson's property constituted its conversion; and since its found actual value ($1,732) was slightly in excess of the amount of Wallace's debt plus the amount of the trial court's judgment against him ($1,104.56 +$622.44=$1,727), the error of the· trial court in predicating his judgment upon the cancellation theory is harmless, so far as Wallace is concerned. He, therefore, cannot, and Burson does not, complain.

The trial court's judgment is affirmed.

Affirmed.

### On Motion for Rehearing.

Wallace has filed an elaborate motion for rehearing presenting nine assignments of error. The gist of these assignments is that we erred in treating the wrongful sequestration as a conversion and in applying the measure of damages applicable thereto. It is urged that the proper measure of damages was the value of the use of the property, and the proper judgment would be in favor of Wallace for the balance due on his note, less a proper credit covering the value of the use of the property, and foreclosure of his lien.

Since we did not discuss this point in our original opinion, we think it proper to do so now.

One of the cases relied upon is Laseter v. Hyde (Tex. Civ. App.) 65 S.W.(2d) 388, 389. The point decided there has no application here. The appeal there involved the liability of sureties upon a replevy bond executed ,by the defendant who owned the property subject to plaintiff's mortgage lien. The property had been in fact delivered to plaintiff prior to the foreclosure, and the gist of the decision in this regard is thus stated: "Since the property had been turned over to the plaintiff prior to the trial, the obligation of the sureties had been discharged, except as to their liability for damages."

The liability of one who obtains possession of property under court process wrongfully procured is not the same as that of sureties upon a replevy bond executed by the owner of the property.

That such wrongful act constitutes a conversion is well established.

"Any distinct act or dominion wrongfully exerted over one's property in denial of his right, or inconsistent with it, is a conversion." Cooley on Torts (2 Ed.) p. 524, cited with approval in Crawford v. Thomason, 53 Tex. Civ. App. 561, 117 S. W. 181 (error refused), a wrongful sequestration case, as noted below.

"One who intentionally dispossesses another of a chattel without his consent or other privilege to do so is liable to the other either as a treaspasser or as a converter for the value of the chattel except as stated in Secs. 247 and 249." Am. Law Inst. Restatement of Torts, vol. 1, § 222.

"Section 249 deals with circumstances which bar a recovery by the possessor," and has no application here.

The pertinent portions of section 247 read:

"One who has become liable for the conversion of a chattel can mitigate the damages for which he is liable by an offer to return it, if

"(a) the chattel was converted in good faith and without knowledge or reasonable belief that the actor was not entitled to so deal with the chattel."

We are not here concerned with those cases possessing the elements of "good faith and without knowledge or reasonable belief that the actor was not entitled to so deal with the chattel." ‘ The actor here wrongfully used the judicial process to wrest possession from the owner. This wrongful use consisted in procuring issu-

ance of the process upon an affidavit falsely asserting the existence of the conditions which would render such issuance lawful. There is no distinction in reason, and none in law, between obtaining possession through wrongfully procured legal process, and obtaining it wrongfully by force, fraud, or otherwise. The effect is the same, and each is equally unlawful. There is therefore no valid basis for a difference in legal remedy.

■■■ The conversion is complete when the owner is wrongfully dispossessed; and it is well settled that the owner has a choice of remedies. He may treat the wrongful taking as a conversion and recover the value of the property at the date of its taking; or he may treat the taking as a trespass and recover the specific property and damages for its use and injury. Of course, his acceptance of its return would bar recovery of its value. See section 249 of the Restatement of Torts. These principles are elementary.

In Weaver v. Ashcroft, 50 Tex. 427, 444, it was said: "Whether the sheriff wrongfully took possession of the entire stock of goods, was, we think, mainly a question of fact. If he did, and the conversion was complete, the fact that he afterwards tendered back the goods, or a part thereof, does not relieve him from full responsibility."

The court (Judge Gould writing) quoted with approval from Hanmer v. Wilsey, 17 Wend. (N. Y.) 91: "But, independent of the fact that the plaintiff had commenced legal proceedings, there was no ground for mitigating damages. The horse had been wrongfully taken, and the plaintiff had a right to insist on being paid the value. The actual return of the horse to the plaintiff's stable without his assent was a matter of no legal consequence. * * * It was a matter of no moment to the plaintiff what became of the horse after the original illegal taking. Replacing the animal in the plaintiff's stable without his assent was a nugatory act; it could no more operate to prejudice the plaintiff than any other disposition which the defendant might have made of the property."

The above case of Crawford v. Thomason was one of wrongful sequestration, under which a house and stock of goods therein had been moved some 30 feet by the sheriff. The court say: "While the sheriff distinctly and repeatedly disclaimed any purpose to take charge of appellees' goods situated in the house, and expressly stated that his only purpose was to move the house from the strip of land claimed by appellants in the suit, we are yet constrained to hold that his acts in pulling apart the two sections of the house and moving it with all its contents 30 feet back from its former location, thereby necessarily interrupting appellees' business, was the exercise of dominion over the property inconsistent with appellees' title and substantially an ouster of plaintiffs from the possession thereof."

The court's holding is thus epitomized in the syllabus: "When a wrong complained of amounts to a conversion, the injured party has the right to so treat it and to sue for the value of the property so taken, and also to refuse to accept the property when the wrongdoer offers to return it."

The case of Gilroy v. Rowley (Tex. Civ. App.) 210 S. W. 623, 624, is virtually on all fours with the case at bar. There the plaintiff had wrongfully sequestered real estate held under lease by defendant. The question was the right of defendant to recover, in reconvention, the value of growing crops. The trial court refused to submit to the jury the question: "Were defendants given an opportunity to harvest all crops that they seeded and cultivated during the term of the lease in evidence?"

In disposing of this issue, the court say: "It having been determined that the writ of sequestration was wrongfully issued and served, the taking of the property amounted to a conversion, and the defendants had the right to refuse the offer."

■■■ Neither the fact that Wallace had a valid lien upon the property, nor that Burson had previously purchased it from Wallace, in any way affected his liability as a converter, or the measure of relief to which Burson was entitled. Sabine Motor Co. v. English Auto Co. (Tex. Com. App.) 291 S. W. 1088.

The motion is overruled.

Overruled.